SCHWARTZ, Chief Judge.
Mrs. Perkins appeals from a determination[1] terminating her aid for dependent children (AFDC) benefits on the ground that she owned[2] and then improperly *1317 transferred[3] a valuable “asset” which disqualified her from that assistance. We find as a matter of law that the purported asset was not owned by Mrs. Perkins so as to disqualify her for benefits and therefore reverse the order under review.
The so-called “asset,” the nature of which is in issue here, was a $14,698 bank account established out of her own funds in 1977 by Mrs. Tartaglia, Mrs. Perkins’s mother, for the benefit of her grandson, Mrs. Perkins’s son, Eugene, a handicapped child. The sole purpose of the account, which was set up in the name of Mrs. Perkins in trust for Eugene, was to provide benefits for the boy’s education in the event of Mrs. Tartaglia’s death. Mrs. Perkins, who was referred to below as a person of “limited cognitive abilities,” was not aware, although she had been told by her mother to sign some papers in 1977, that these documents had created the account or had any knowledge of its existence until the HRS brought it to her attention a decade later. In the meantime, she had made no deposit or withdrawal, received no statement or other communication from the bank concerning it, and had, in short, nothing whatever to do with it during its existence. Instead, Mrs. Tartaglia was sent the statements and retained total control over the account — a control which was demonstrated by the fact that, at her virtual command, Mrs. Perkins conveyed the account to her when an issue was made of its existence by the agency. (The catch-22 nature of this particular bureaucratic maneuver is shown by the fact that, when the HRS told Mrs. Perkins that she was disqualified because she “owned” the asset, Mrs. Tartaglia immediately effected its transfer to herself, whereupon Mrs. Perkins was at once disqualified for having transferred it.)
Under these circumstances, as demonstrated by the testimony of both Mrs. Perkins[4] and Mrs. Tartaglia,[5] the effective, equitable ownership of the funds was never *1318 transferred from Mrs. Tartaglia to Mrs. Perkins in the first instance and thus could not constitute a disqualifying asset which she ever “own[ed].” Fla.Admin.Code Rule IOC 1.099(1). This conclusion follows either upon the analysis that there was no valid gift because of the absence of both the required intent to transfer and an actual transfer of dominion and control over the res in question, Canova v. Florida Nat’l Bank, 60 So.2d 627 (Fla.1952); Jones v. Ferguson, 150 Fla. 313, 7 So.2d 464 (1942) (en banc), or from the simple observation that a mere trustee, which is the only status that Mrs. Perkins had with respect to the account, holds only legal and not equitable title to the trust property. 56 Fla.Jur.2d Trusts § 11 (1985). See McKenzie v. Standard Accident Ins. Co., 198 S.C. 109, 16 S.E.2d 529 (1941) (funds created by rents and profits in administrator’s custody as trustee not “assets” of the estate); First Nat’l Bank v. Hummel, 14 Colo. 259, 23 P. 986 (1890) (money or other property held by deceased in trust or as bailee not his “assets”).
Indeed these legal principles are reflected in the pertinent. HRS regulations themselves. Rule 100-1.099(5) provides:
(5) Assets not accessible to the child, parent or relative due to legal restrictions or factors beyond their control are considered unavailable provided the legal restrictions were not induced or created by the parent or relative. Department legal staff determine availability of assets with legal restrictions.
Fla.Admin.Code Rule 1001.099(5). It is obvious, for the reasons we have already stated, that the account was not “accessible to [Mrs. Perkins][6] ... due to legal restrictions or factors beyond [her] con-trol_” Fla.Admin.Code Rule 10C-1.-099(5); see also Torres v. Department of Health and Rehabilitative Servs., 384 So.2d 978 (Fla. 3d DCA 1980).
The obvious purpose of the asset restriction regulation is to preclude the taxpayers from an obligation to support a family when it may draw instead upon its own property for support. The undisputed facts of this case, however, show that the account could not and was not used by Mrs. Perkins or her dependent child. It was therefore improper to disqualify her on that ground. For this reason, we reverse with directions to afford her the benefits claimed.
REVERSED AND REMANDED.

. Our disposition of this case makes it unnecessary for us to consider the propriety of the disposition below in which the order was executed not by the hearing officer who heard and purportedly determined the case, but by her administrative supervisor. But see Silvern v. Silvern, 252 So.2d 865 (Fla. 3d DCA 1971); Anders v. Anders, 376 So.2d 439 (Fla. 1st DCA 1979).

. 10C-1.099 Assets.
(1) Assets are items of monetary value which a family owns. The equity value of available countable assets owned by the child, parent or relative must not exceed $ 1,000.
(2) The assets of the following persons will be considered:
(a) All eligible children who are under 18 years of age living in the home and whose needs are included in the ADFC direct assistance grant.
(b) The parent who lives in the home or if away from home meets the conditions of temporary absence, even if the parent is not eligible to have his or her needs included in the grant.
Fla.Admin.Code Rule 10C-1.099(1), (2)(a)-(b).

. 10C-1.099 Assets.
******
(7) To be eligible for AFDC, the child, parent or relative must not have made an assignment, sale, gift or transfer of assets, including property and cash, which in fact would affect eligibility, with the intent by this method of making or keeping the assistance group AFDC eligible....
Fla.Admin.Code Rule 10C-1.099(7).

. Q. When was the first time that you were aware that the account existed.
A. I received a letter in the mail at my house that I had this money and I didn’t know anything about it.
******
Q. Do you remember an occasion in 1977 when you went [to] the bank with our mother and she asked you to sign something?
A. Yes, but I haven’t asked her any questions. I am close to my mother and whenever she tells me to do something, I do it. We’re very close.
Q. So you never were aware?
A. No sir.
Q. You did know the amount of the original amount?
A. No sir I knew nothing of the account.
Q. And of course when your mother told you to sign the paper you signed?
A. Yes sir.
******
Q. Elvira had your mother said she was opening an account for you, that you were never to touch the monies, and they were still hers, and upon her death you were to use money for the education of your children, would you have upheld those wishes? Would you have gone along with whatever your mother told you?
A. Yes, yes, I would.
Q. You would never have touched a dime of this money
A. No.
Q. In fact, you never knew of this account and never questioned any of it?
A. No sir.

.Q. Ms. Tartaglia what was your purpose in opening this account?
A. Well I knew the grandchildren were never gonna be college material because she was notified of that disability. So I figured that I would do something for them because she could take or they could learn a trade. That’s how I controlled her when she heard the news.
Q. That’s in case of your death?
A. That’s — that’s when the that is it.
Q. ... did you intend to retain control of this account?
A. Definitely.
*1318 Q. And did you?
A. I did.
Q. And where did the statements for this account go?
A. To 2930 SW 19th Street which is my address.
Q. Which is your address?
A. Right.
Q. Did you consider this money still yours?
A. Definitely.
Q. As a matter of fact it was available to you at any time that you wanted it.
A. Any time because if I wanted to I would change things again all she would have done is sign again. She never asked me no questions.
******
Q. Has your daughter ever had any access to the account?
A. Never.
Q. Has she ever made a withdrawal?
A. Never.
Q. Has she ever made a contribution?
A. Never.

. Rule 100-1.099(5) refers to assets not accessible “to the child, parent or relative.” Under the pertinent definitions, Mrs. Perkins is the "parent.” The account was admittedly not accessible to Eugene Roger Perkins, the "child,” until Mrs. Tartaglia’s death. “Relative” refers to a "relative who is caretaker of the child" and who applies for the grant, see Fla.Admin.Code Rule 10C-1.099(2)(f), which does not include Mrs. Tartaglia.